**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MOUNTAIN STATES HEALTH ALLIANCE,** )<br><br>)<br>)<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**SYLVIA M. BURWELL,** )<br>**Secretary, U.S. Department of Health** )<br>**and Human Services,** )<br>)<br>**Defendant.** )<br>) | **Civil Action No. 13-641 (RDM)** |

**MEMORANDUM OPINION**

Under the governing regulations, a Medicare provider is entitled to reimbursement for

unpaid deductibles and copayments—referred to as "Medicare bad debt"—but only if certain

requirements are met.  Among other things, the regulations require that the provider establish that

it has engaged in "reasonable collection efforts" before declaring a debt uncollectible.  42 C.F.R.

§ 413.89(e).  That requirement is further explicated in section 310 of the Provider

Reimbursement Manual, which specifies that, in order to qualify as a "reasonable collection

effort, a provider's effort must be similar to the effort the provider puts forth to collect

comparable amounts from non-Medicare patients."  Center for Medicare and Medicaid Services

Pub. 15-1, § 310 (2003).  The Provider Reimbursement Manual further states that "[w]here a

collection agency is used, Medicare expects the provider to refer all uncollected patient charges

of like amount to the agency without regard to class of patient," that is, without regard for

whether the charges were incurred by a Medicare or non-Medicare patient.  *Id.* § 310.A.

This case involves a challenge to the application of these rules in a decision by the Secretary of Health and Human Services ("Secretary")[1] denying Plaintiff reimbursement for unpaid Medicare bad debt for the cost reporting periods ending June 30, 2004 and June 30, 2005. *See Mountain States Health Alliance 05 Bad Debt–Passive Collection CIRP Grp. v. BlueCross BlueShield Ass'n/Cahaba Gov't Benefits Adm'rs, LLC*, PRRB Dec. No. 2013-D6 (Mar. 4, 2013) ("Board Decision"), AR 6-18.[2]  Plaintiff, Mountain States Health Alliance, is the owner of two acute care hospitals ("Providers") in Tennessee.  For the reporting periods at issue, the Providers first engaged in in-house collection efforts without distinguishing between Medicare and non-Medicare accounts.  To the extent those efforts failed, they then referred the debts to an outside, "primary" collection agency—again, without distinguishing between Medicare and non-Medicare accounts.  But to the extent that second round of efforts also failed, they adopted different approaches for Medicare and non-Medicare accounts.  For non-Medicare accounts, the Providers sent all but those where the patient was bankrupt, deceased with no estate, incarcerated, or a charity to a "secondary" collection agency.  In contrast, they declared all of the remaining Medicare bad debt "uncollectible" and, on that basis, sought reimbursement under the Medicare program.

The Secretary denied reimbursement on the ground that the Providers did not use similar efforts to collect Medicare and non-Medicare bad debt and, in particular, continued to employ collection agencies to pursue certain non-Medicare debt, but not Medicare debt.  Dissatisfied

---

[1]  The action was originally brought against Secretary Kathleen Sebelius.  Pursuant to Federal Rule of Civil Procedure 25(d), however, Secretary Burwell is automatically substituted for Secretary Sebelius.

[2]  Citations are to the administrative record ("AR").  Dkt. 21.

with that result, Plaintiff brought this action, alleging that (1) section 310 of the Provider

Reimbursement Manual constitutes a "legislative rule," which the Secretary failed to adopt

pursuant to the required notice and comment procedures, (2) the Secretary failed to "list" section

310 in the Federal Register, as required by statute, (3) the Secretary's decision departed from

Medicare policy in place on August 1, 1987, and thus violated the congressionally-mandated

"Bad Debt Moratorium," and (4) the Secretary's decision was, in any event, arbitrary and

capricious.  *See* Dkt. 16 at 20, 26.

The matter is now before the Court on cross-motions for summary judgment.  For the

reasons explained below, the Court **GRANTS** in part and **DENIES** in part Plaintiff's motion for

summary judgment, Dkt. 16, **DENIES** the Secretary's cross-motion for summary judgment, Dkt.

17, **VACATES** the Board's decision, and **REMANDS** for further proceedings consistent with

this Memorandum Opinion.  A separate Order accompanies this decision.

## I.  BACKGROUND

## A.  Statutory And Regulatory Background

### 1.  *The Medicare Provider Reimbursement System*

The Medicare program provides healthcare for the elderly and disabled.  *See* 42 U.S.C.

§§ 1395 *et seq*.  Participating health care providers collect deductibles and coinsurance amounts

directly from Medicare patients and are reimbursed for other costs through the Medicare

program.

As relevant here, providers are reimbursed for various direct and indirect "reasonable

costs."  *See generally* 42 C.F.R. Part 413; 42 U.S.C. § 1395x(v)(1)(A).  The provider bears the

burden of supplying information establishing that the costs for which it seeks reimbursement are

"reasonable costs" eligible for reimbursement under the relevant regulations.  *See, e.g.*, 42 C.F.R.

§ 413.24(a).  Providers file annual cost reports, which are reviewed by private administrative contractors authorized by the Center for Medicare and Medicaid Services ("CMS").  *See* 42 U.S.C. § 1395h; 42 C.F.R. § 413.24(f).  During the years at issue here, these private contractors were called "fiscal intermediaries."  *See* 42 U.S.C. § 1395h (2000).  Intermediaries evaluate the annual cost reports under the Secretary's regulations and informal guidance, particularly the Provider Reimbursement Manual, which includes the Secretary's "guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services."  *See* CMS Pub. 15-1, Part I, Forward, (2003) (hereinafter "PRM").  The intermediary determines the amount of reimbursement to which the provider is entitled and issues a "Notice of Program Reimbursement."

A provider that is dissatisfied with an intermediary's reimbursement determination may appeal to the Provider Reimbursement Review Board ("the Board").  *See* 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1835, 405.1837.  The Board is bound by the Secretary's regulations and "shall afford great weight to interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS," including the PRM.  *See* 42 C.F.R. § 405.1867.  The provisions in the PRM, however, "do not have the force and effect of law and are not accorded that weight in the adjudicatory process."  *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995).

A Board decision becomes the final decision of the Secretary unless the CMS Administrator, acting on the Secretary's behalf, elects to review it.  *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875(a)(1).  A provider that is dissatisfied with the Secretary's final decision may seek judicial review in federal district court.  42 U.S.C. § 1395oo(f)(1).

### 2.    *Medicare Bad Debt*

Uncollected Medicare deductibles and coinsurance amounts are collectively referred to as "Medicare bad debt." *See, e.g.*, *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 720 (D.C. Cir. 2009); 42 C.F.R. § 413.89(a).  Medicare "reimburses providers for this 'bad debt'" in order to prevent cross-subsidization, *i.e.*, "a cost shift from the Medicare recipient to individuals not covered by Medicare."  *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 786 (9th Cir. 2003); *see also* 42 C.F.R. § 413.89(d); *Abington*, 575 F.3d at 720.

Under the governing regulations, providers seeking reimbursement for Medicare bad debt must demonstrate that the debt satisfies four criteria:

(1)   The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2)   The provider must be able to establish that reasonable collection efforts were made.

(3)   The debt was actually uncollectible when claimed as worthless.

(4)   Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e); *see* Principles for Reimbursable Costs, 31 Fed. Reg. 14808, 14813 (Nov. 22, 1966) (final rule).  This case involves the second requirement, "reasonable collection efforts."  Neither the regulation nor the Medicare Act defines "reasonable collection efforts," but the Secretary has provided her interpretation in section 310 of the PRM.  That provision explains that "[t]o be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients."  PRM § 310.  Section 310 further

explains that if a provider elects to refer its non-Medicare accounts to a collection agency, the

provider must similarly refer its Medicare accounts of "like amount":

> Where a collection agency is used, Medicare expects the provider to refer
> all uncollected patient charges of like amount to the agency without regard
> to class of patient.  The 'like amount' requirement may include uncollected
> charges above a specified minimum amount.  Therefore, if a provider refers
> to a collection agency its uncollected non-Medicare patient charges which
> in amount are comparable to the individual Medicare deductible and
> coinsurance amounts due the provider from its Medicare patient, Medicare
> requires the provider to also refer its uncollected Medicare deductible and
> coinsurance amounts to the collection agency.

PRM § 310.A.  Section 310 was last revised in 1983.  *See* Dkt. 26-1 (HCFA Transmittal No. 246,

Feb. 1981); Dkt. 26-2 (HCFA Transmittal No. 278, Jan. 1983).

### 3.  *The "Bad Debt Moratorium"*

In 1987, Congress enacted legislation to "freeze" the Secretary's Medicare bad debt

reimbursement policies.  *Hennepin Cnty. Med. Ctr. v. Shalala*, 81 F.3d 743, 751 (8th Cir. 1996);

*see also Foothill Hosp. v. Leavitt*, 558 F. Supp. 2d 1, 3-5 (D.D.C. 2008).  This legislation,

typically referred to as the "Bad Debt Moratorium," provides in relevant part that "the Secretary

of Health and Human Services shall not make any change in the policy in effect on August 1,

1987, with respect to payment . . . for reasonable costs relating to unrecovered costs associated

with unpaid deductible and coinsurance amounts incurred under [the Medicare program]

(including criteria for what constitutes a reasonable collection effort, including criteria for

indigency determination procedures, for record keeping, and for determining whether to refer a

claim to an external collection agency)."  *See* Omnibus Budget Reconciliation Act of 1987

("OBRA"), Pub. L. No. 100-203, tit. IV, § 4008(c), 101 Stat. 1330-55, *as amended by* Technical

and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, tit. VIII, § 8402, 102 Stat. 3798,

*reprinted as amended at* 42 U.S.C. § 1395f note (2012).  In 1986, the Inspector General of the

6

Department of Health and Human Services ("HHS") had proposed substantial changes regarding the Medicare program's treatment of bad debt. *See Hennepin Cnty.*, 81 F.3d at 747, 750-51; *Foothill Hosp.*, 558 F. Supp. 2d at 3-5, 6-7. Congress responded by enacting the Bad Debt Moratorium. *Foothill Hosp.*, 558 F. Supp. 2d at 3. The conference report explains that the conferees adopted the House-proposed provision, which "[p]rohibits the Secretary from making any change in policy in effect on August 1, 1987 on payments for Medicare bad debt," H.R. Rep. 100-495, 543 (1987) (Conf. Rep.), but added language "to prohibit the Secretary from modifying the criteria for what constitutes a reasonable collection effort," *id.* at 547.

The language "criteria for indigency determination procedures, for record keeping, and for determining *whether to refer a claim to an external collection agency*" was added in 1988, a year after the original enactment of the Bad Debt Moratorium. Pub. L. No. 100-647, tit. VIII, § 802 (emphasis added). The 1988 conference report explains that Congress made this amendment because it was "concerned about [further] recommendations made by the Inspector General of HHS subsequent to August 1, 1987, and actions which may be taken by the Secretary in response to those recommendations, regarding the bad debt collection policies followed by certain hospitals." H.R. Rep. No. 100-1104 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 5048, 5337. The conference report further explains that the amended provision was not "intend[ed] to preclude the Secretary from disallowing bad debt payments based on regulations, PRRB decisions, manuals, and issuances in effect prior to August 1, 1987." *Id.* Rather,

> [t]he conferees wish to clarify that the Congress intended that the actions of
> fiscal intermediaries occurring prior to August 1, 1987 to approve explicitly a
> hospital's bad debt collection practices, to the extent such action by the fiscal
> intermediary was consistent with the regulations, PRRB decisions, or

program manuals and issuances, are to be considered an integral part of the policy in effect on that date, and thus not subject to change.

*Id*.

In 1989, Congress again amended the Bad Debt Moratorium, this time to provide that "[t]he Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, acting in accordance with the rules in effect as of August 1, 1987, . . . has accepted such policy before that date, . . ." Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, tit. VI, § 6023, 103 Stat. 2167. Because Plaintiff does not contend that its policy was approved by a fiscal intermediary before 1987, this particular aspect of the Moratorium is not at issue here. The Bad Debt Moratorium ended on October 1, 2012. *See* Pub. L. No. 112–96, tit. III, § 3201(d), 126 Stat. 192, *reprinted at* 42 U.S.C. § 1395f note.

## B.  Factual Background

Plaintiff owns and operates Providers Johnson City Medical Center and Indian Path Medical Center, two acute care facilities in Tennessee that provide Medicare services. AR 10. During the two years at issue in this case, 2004 and 2005, Plaintiff's hospitals had a policy of treating the accounts of Medicare and non-Medicare patients similarly for approximately one year. The accounts were first subjected to in-house collection efforts for six months. *See* AR 13, 15. The accounts were then referred to a primary collection agency. *See id.* After six months of unsuccessful collection efforts at the primary collection agency, however, the Medicare and non-Medicare accounts were sent in different directions. The non-Medicare accounts were sent to a secondary collection agency, with the exception of accounts deemed "uncollectible" due to bankruptcy, death, incarceration, or charitable status. *See* AR 12, 15, 81, 86, 95. In contrast, all the Medicare accounts were returned to the Providers and written off as Medicare bad debts,

without regard for the amount of the account, the status of the patient, or other individualized considerations.  AR 12, 13, 15, 85.[3]

When the Providers sought reimbursement for the cost reporting years ending on June 30, 2004 and June 30, 2005, the fiscal intermediary excluded approximately $700,000 in Medicare bad debts.  AR 19.  The intermediary's auditor acknowledged that one of the Providers "perform[ed] a thorough collection effort[ ] on all payor types prior to sending the bad debts to a primary collection agency.  The primary agency also perform[ed] thorough collection efforts on all payor types."  AR 336-39.  Nonetheless, the intermediary disallowed the Medicare bad debts because the Providers had referred non-Medicare accounts to a secondary collection agency, but had not referred Medicare accounts of like amount, and therefore had not satisfied the "reasonable collection efforts" requirement set forth in the relevant regulation, 42 U.S.C. § 413.89(e).  AR 10-13.

Plaintiff timely appealed to the Board on behalf of each Provider.  AR 12.  The Board held a hearing on the consolidated appeals, at which it heard testimony from Plaintiff's corporate director of reimbursement and a representative from Plaintiff's collection agency.  *See* AR 64-111, 66.  Plaintiff argued that the Providers satisfied all the requirements imposed by the regulation regarding "reasonable collection efforts," 42 U.S.C. § 413.89(e), as interpreted by section 310 of the PRM.  Plaintiff contended that the Providers had subjected Medicare and non-Medicare accounts to identical collection efforts for at least a year, *see* AR 10-11, including submitting all accounts to a first collection agency, *id.*, and that the Providers exercised good

---

[3]  After the fiscal intermediary denied reimbursement of the Providers' Medicare bad debts for the cost years ending in 2004 and 2005, the Providers changed their policies and began referring Medicare accounts to a secondary collection agency in 2006.  AR 84.

business judgment in discontinuing their efforts to collect the Medicare accounts after a year

because those accounts are on average smaller and more difficult to collect, *id.*  Plaintiff argued

that this policy satisfied section 310's requirement that "similar" collection efforts be expended

with respect to a provider's Medicare and non-Medicare accounts.  *See id.*  Plaintiff also argued

that to the extent the Secretary's policy required more, that policy violated the Bad Debt

Moratorium because, prior to the Moratorium, the Secretary had reimbursed Medicare bad debt

even where providers referred *only* non-Medicare accounts to collection agencies.  *See* AR 11-

12.

      The Board affirmed the fiscal intermediary's denial of reimbursement.  *See* AR 13-18.  It

agreed with the intermediary that Plaintiff's hospitals had failed to satisfy the "reasonable

collection efforts" requirement, *see* AR 14, 17, explaining that "[t]he key principle . . . for

determining whether a provider's efforts to collect Medicare deductible and coinsurance amounts

is 'reasonable' is that such efforts are 'similar' to the provider's efforts to collect 'comparable'

amounts from non-Medicare patients," AR 14.  Furthermore, where a provider uses a collection

agency, "CMS requires providers to refer all uncollected patient charges of 'like amount' to the

collection agency without regard for class of patient."  AR 15.

      The Board emphasized that the Providers did not decide whether to refer a given

Medicare account "based on the actual documented collectability of the individual account (*e.g.*,

bankrupt or deceased patient) or on a global threshold amount by which Medicare and non-

Medicare accounts were referred alike."  AR 16.  Instead, "[t]he record reflects that . . . for

delinquent Medicare accounts, the Providers made a single global decision not to refer

[Medicare] accounts to the secondary collection agency based on attributes believed by the

Providers to generally exist across Medicare accounts as a whole," *i.e.*, "that the Medicare

population *on average* is retired and not gainfully employed, is not necessarily going to borrow money, is living off retirement and social security income, presents difficulty with regards to pursuing property liens and wage garnishments, and has no regard for a lower credit score."  AR 16 (emphasis in original).  The Board concluded that the exclusion of the Medicare accounts "on a global basis" from referral to the secondary collection agency "did not comply with the regulatory requirement that reasonable collection efforts were made."  AR 17.

The Board also concluded that the Secretary's policy did not violate the Bad Debt Moratorium.  AR 16-17.  Plaintiff argued that three prior Board decisions construed section 310 to impose a requirement for like treatment of Medicare and non-Medicare accounts, but had not imposed the type of categorical rule applied by the intermediary.  According to Plaintiff, by applying an inflexible rule, the intermediary had changed the governing bad debt policy in violation of the Moratorium.  In response, the Board explained that the three administrative decisions cited by Plaintiff applied the bad debt reimbursement policy in effect for cost years prior to January 1983.  AR 16.  Because section 310 was revised in January 1983, and because it was the revised version of section 310 that was in effect when the Moratorium was enacted in August 1987, the Board concluded that the pre-1983 decisions were "not relevant to the Bad Debt Moratorium issue."  *Id.*  The Board also concluded that a fourth administrative decision, rendered in 1996, was not illustrative of the Secretary's policy in August 1987, because it was issued after the effective date of the Bad Debt Moratorium and, in any event, relied on the three decisions applying the pre-1983 policy, which the Board had already concluded were irrelevant. AR 16-17.

When the CMS Administrator declined to review the Board's decision, it became the final decision of the Secretary.  Plaintiff timely appealed to this Court, the parties filed cross-

motions for summary judgment, and, on May 5, 2015, the Court heard oral argument.  The Court

then directed the parties to submit copies of the HHS Inspector General Report cited in *Foothill*

*Hospital v. Leavitt*, 558 F. Supp. 2d 1, 3 (D.D.C. 2008), and "supplemental materials relating to

the interpretation of the Bad Debt Moratorium, such as legislative history, administrative

decisions, and HHS guidance documents."  *See* May 6, 2015, Minute Order; *see also* Dkts. 25,

26, 27.  The parties filed memoranda addressing the supplemental materials.  *See* Dkts. 29, 30.

## II. STANDARD OF REVIEW

Pursuant to the Medicare Act, 42 U.S.C. § 1395oo(f)(1), this Court reviews the final

decision of the Secretary under the applicable provisions of the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701 *et seq.*  The Court will set aside the Secretary's decision only if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  "'Put simply, the

[APA] requires that an agency's exercise of its statutory authority be reasonable and reasonably

explained.'"  *USPS v. Postal Reg. Comm'n*, 785 F.3d 740, 753 (D.C. Cir. 2015) (quoting *Mfrs.*

*Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012)).  The Court will set aside

the Board's factual findings "only if unsupported by substantial evidence on the record as a

whole."  *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007).

The Court affords "substantial deference" to the Secretary's views with respect to the

Medicare Act and her implementing regulations.  *See Thomas Jefferson Univ.*, 512 U.S. at 512.

Courts generally "defer to an agency's interpretation of its regulations, . . . unless the

interpretation is plainly erroneous or inconsistent with the regulation[s] or there is any other

reason to suspect that the interpretation does not reflect the agency's fair and considered

judgment on the matter in question."  *FiberTower Spectrum Holdings, LLC v. FCC*, 782 F.3d

692, 699 (D.C. Cir. 2015) (quotation marks omitted).  More specifically, the Court of Appeals

has recently reviewed the Secretary's interpretation of her bad debt regulations, 42 C.F.R.

§ 413.89(e), under a standard requiring deference "'unless an alternative reading is compelled by

the regulation's plain language or by other indications of the [agency's] intent at the time of the

regulation's promulgation.'"  *Grossmont Hosp. Corp. v. Burwell*, 2015 WL 4666540, *5-*6

(D.C. Cir. Aug. 7, 2015) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512).  This Court follows

suit.

## III.  ANALYSIS

As explained above, the Medicare Act authorizes reimbursement of "reasonable costs"

incurred by providers.  *See* 42 U.S.C. §§ 1395f(b)(1), 1395x(v)(1)(A).  "Congress," moreover,

"has given the Secretary considerable discretion to promulgate cost-reimbursement regulations

that give meaning to the term 'reasonable costs.'"  *Villa View Cmty. Hosp., Inc. v. Heckler*, 728

F.2d 539, 540 (D.C. Cir. 1984) (per curiam); *see also Guernsey Mem. Hosp.*, 514 U.S. at 91-93.

The parties do not dispute that the regulation governing reimbursement for Medicare bad debt,

42 C.F.R. § 413.89, represents a valid exercise of the Secretary's authority to interpret the

Medicare Act.  Nor has Plaintiff challenged the validity of the requirement that providers

"establish that reasonable collection efforts were made."  42 C.F.R. § 413.89(e).  Plaintiff

challenges only the Secretary's interpretation of that regulatory language to require that, if a

provider refers non-Medicare accounts to a secondary collection agency, it must also refer

Medicare accounts of like amount to a secondary collection agency.  *See* PRM § 310.

Plaintiff first argues that PRM section 310 is invalid because it is a legislative rule that

was promulgated without satisfying APA notice and comment procedures.  Plaintiff also argues

that the Secretary cannot rely on section 310 because it was not "listed" in the Federal Register,

as required by statute.  Next, Plaintiff argues that the Secretary's policy departs from the policy

in effect on August 1, 1987, and therefore violates the Bad Debt Moratorium.  Finally, Plaintiff

contends that even if section 310 is valid, the disallowance of the Providers' Medicare bad debt

was arbitrary and capricious.  The Court will address each argument in turn.

**A.  Is Section 310 A Legislative Rule?**

Plaintiff's first argument is that section 310 is invalid because it is an improperly

promulgated legislative rule.  Legislative rules (also called "substantive rules") are subject to the

APA's notice-and-comment requirements.  *See* 5 U.S.C. § 553; *see also* 42 § U.S.C.

1395oo(f)(1).  In contrast, interpretive rules, which "are 'issued by an agency to advise the public

of the agency's construction of the statutes and rules which it administers[,]' . . . do not carry the

force and effect of law, and they need not be promulgated pursuant to notice and comment

procedures under the APA."  *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 716

(D.C. Cir. 2015) (quoting *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015)).

Section 310 was not promulgated using notice-and-comment procedures.  Thus, the Court must

determine whether section 310 is a legislative rule subject to those requirements, or an

interpretive rule.[4]

Legislative rules are those that "grant rights, impose obligations, or produce other

significant effects on private interests."  *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir.

1980).  In contrast, interpretive rules "clarify a statutory or regulatory term, remind parties of

---

[4]  A policy statement is another type of non-legislative rule.  *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015).  "Policy statements 'are binding on neither the public nor the agency,' and the agency 'retains the discretion and the authority to change its position . . . in any specfic case.'"  *Id.* (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93-94 (D.C. Cir. 1997)).  The parties do not contend that section 310 is a policy statement.

existing statutory or regulatory duties, or merely track preexisting requirements and explain

something the statute or regulation already required." *Mendoza v. Perez*, 754 F.3d 1002, 1021

(D.C. Cir. 2014)) (quotation marks omitted).  An interpretive rule "must derive a proposition

from an existing document whose meaning compels or logically justifies the proposition."

*Catholic Health Initiatives v. Sebelius* ("*CHI*"), 617 F.3d 490, 494 (D.C. Cir. 2010).  Although at

times elusive, this dividing line is an essential one.  Indeed, as the Court of Appeals has

admonished, "the purpose of the APA would be disserved if an agency with a broad statutory

command . . . could avoid notice-and-comment rulemaking simply by promulgating a

comparably broad regulation . . . and then invoking its power to interpret that statute and

regulation in binding the public to a strict and specific set of obligations."  *Elec. Privacy Info.*

*Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011) ("*EPIC*"); *see also Perez*,

135 S. Ct. at 1211-12 (Scalia, J., concurring).

"The court's inquiry in distinguishing legislative rules from interpretative rules 'is

whether the new rule effects a substantive regulatory change to the statutory or regulatory

regime.'"  *Mendoza*, 754 F.3d at 1021 (quoting *EPIC*, 653 F.3d at 6-7).  Traditionally, courts in

this jurisdiction consider several factors to determine "whether the purported interpretive rule has

'legal effect'" on regulated parties.  *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d

1106, 1112 (D.C. Cir. 1993).  These factors include (1) "whether in the absence of the rule there

would not be an adequate legislative basis for enforcement action or other agency action to

confer benefits or ensure the performance of duties, (2) whether the agency has published the

rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general

legislative authority, [and] (4) whether the rule effectively amends a prior legislative rule."  *Id.* at

1112.  Courts also consider the agency's characterization of its rule and whether the rule has

been applied consistently in the past, although these factors are not dispositive, and "[a] reviewing court need not classify a rule as interpretive just because the agency says that it is." *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989). Ultimately, the process of distinguishing between legislative and interpretive rules is an "extraordinarily case-specific endeavor." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987).

As an initial matter, the Court can readily conclude that section 310's status as a provision in the PRM is not dispositive. Rather, as the parties recognize, the Supreme Court and the Court of Appeals have upheld some PRM provisions as valid interpretive rules, while rejecting others as improperly promulgated legislative rules. Determining where each of these precedents lies on the "hazy continuum" between legislative and interpretive rules, *id.*, provides substantial guidance regarding the proper characterization of section 310.

In *Guernsey Memorial Hospital*, the Supreme Court considered whether section 233 of the PRM constituted a legislative rule or an interpretive rule. 514 U.S. 87, 90-91 (1995). The underlying dispute focused on whether the provider was "entitled to full reimbursement in one year" for a "defeasance loss" resulting from issuance of capital improvement bonds, or whether, as the Secretary maintained, the loss had to be amortized over a period of years. *Id.* at 90. The Court first concluded that the governing Medicare regulations did not resolve the question. *Id.* at 94-95. Section 233, however, did, and it required amortization of the loss. *Id.* at 97-98. Against this backdrop, the Court rejected an argument much like the one Plaintiff makes here. It concluded that section 233 implemented the relevant statutory and regulatory rules "in a reasonable way," *id.*, and that section 233 was, accordingly, "a prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *id.* at 99-100 (quotation marks and citation omitted).

16

Because the rule was interpretive, and lacked the force of law, the Court rejected the contention that notice and comment rulemaking was required. *Id.* at 99. Finally, the Court stressed that notice and comment would be required if the PRM were revised to "adopt[ ] a new position inconsistent with any of the Secretary's existing regulations." *Id.* at 100.

Similarly, in *National Medical Enterprises v. Shalala*, the Court of Appeals held that section 2203 of the PRM, which "solely sets forth the agency's interpretation of the term 'ancillary' as it relates to hospitals' charging practices," "falls well within the interpretive end of the spectrum." 43 F.3d 691, 697 (D.C. Cir. 1995). As the Court explained, the Medicare regulations "define[d] ancillary services as those services for which charges are customarily made in addition to routine services." *Id.* Section 2203, in turn, looked to state-wide custom, as opposed to the provider's own practice, to determine what is customary. *Id.* at 693-94, 697. The Court concluded that the interpretation adopted in section 2203 was neither plainly erroneous nor inconsistent with the agency's own regulations, *id.* at 697, and that, following this conclusion, "[n]othing of merit remains of the [provider's] claim that section 2203 is a substantive rule requiring notice and comment promulgation," *id.*

The Court of Appeals reached a similar conclusion in *Sentara-Hampton General Hospital v. Sullivan*, which considered whether section 226 of the PRM was a legislative or interpretive rule. 980 F.2d 749, 758-59 (D.C. Cir. 1992). Section 226 interpreted a regulation providing that interest expenses are reimbursable if "incurred to satisfy a 'financial need' of the provider." *Id.* at 752. The Secretary was concerned that providers would borrow money for various projects instead of using funds already invested in interest-bearing depreciation accounts, thereby "reap[ing] a double benefit by receiving reimbursement for their interest expense on current borrowing, while also retaining available [depreciation accounts] and earning protected

17

interest." 980 F.2d at 753.  To avoid this result, he interpreted the governing regulation to mean that a provider has a "financial need" to borrow money only if the funds in its depreciation accounts are "contractually committed" and could not be used.  *Id.*  The Court held that "the Secretary's interpretation of what constitutes 'financial need'" was not arbitrary and capricious because the interpretation "falls easily within the 'range of reasonable meanings' of the term." *Id.* at 756 (quoting *Psych. Inst. of D.C. v. Schweiker*, 669 F.2d 812, 814 (D.C. Cir. 1981)).  It further held that the interpretation did not constitute the improper promulgation of a legislative rule, even though it "made it easier for the Secretary to enforce the regulations."  *Id.* at 759 (stating that "stricter enforcement of the same standard must be distinguished from the enforcement of new obligations.").

In contrast, in *CHI* the Court of Appeals struck down section 2162.2.A.4 of the PRM as an invalidly promulgated legislative rule.  617 F.3d at 492-94.  Section 2162.2.A.4 set forth the Secretary's policy of disallowing reimbursement for insurance premiums paid to certain offshore captive insurance companies (specifically, companies that invested more than 10 percent of their assets in equity securities).  *Id.*  The Secretary argued that this policy was merely an interpretation of the Medicare Act's "reasonable costs" language, explaining that "the cost of insurance premiums that Medicare is asked to reimburse can be considered 'reasonable' only if those premiums actually purchase reliable coverage."  617 F.3d at 493.  According to the Secretary, the captive insurance companies identified by the PRM provision were riskier and less reliable than domestic insurance companies, and accordingly, their premiums were not reasonable costs.  *Id.* at 493-94.  The Court of Appeals rejected this argument.  It held that "there is no way an interpretation of 'reasonable costs' can produce the sort of detailed—and rigid— investment code set forth in § 2162.2.A.4," *id.* at 496, and that "[t]he connection between

18

§ 2162.2.A.4 of the Manual and 'reasonable costs' is simply too attenuated to represent an interpretation of those terms as used in the statute and regulations," *id.* at 496.

The question before the Court, then, is whether section 310 is closer to the PRM provisions upheld in *Guernsey*, *National Medical*, and *Sentara-Hampton* or the provision struck down in *CHI*. Plaintiff, not surprisingly, argues that section 310 is more like the PRM provision struck down in *CHI*. As already noted, in *CHI*, the Court of Appeals invalidated the challenged manual provision, which articulated a "detailed—and rigid—investment code," because "there [was] no way" that code could have resulted from "an interpretation of 'reasonable costs'". 617 F.3d at 494-95; *see id.* at 494 n.3. The Court further explained that when the underlying language "'consists of vague and vacuous terms'" like "'fair and equitable,'" "'just and reasonable'" and "'in the public interest,'" "'the process of announcing propositions that specify applications of those terms is not ordinarily one of interpretation, because those terms in themselves do not supply substance from which the propositions can be derived.'" 617 F.3d at 495 (quoting Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules, and "Spurious" Rules: Lifting the Smog*, 8 ADMIN. L.J. AM. U. 1, 6 n.21 (1994)). Plaintiff argues that "reasonable collection efforts," like "reasonable costs," is a "vague and vacuous" phrase with many possible meanings, and accordingly, the referral requirement is not an interpretation of that phrase. *See* Dkts. 16-1 at 24; 19-1 at 9-15, 17.

The Court is not persuaded that the phrase "reasonable collection efforts" is inherently too vague for interpretation. The "reasonable cost" language at issue in *CHI*, in contrast to the language at issue here, was the statutory lodestar for the entire Medicare reimbursement system. *See* 617 F.3d at 491 (quoting 42 U.S.C. § 1395x(v)(1)(A)). For this reason, the Medicare Act directs that that phrase shall be defined "in accordance with regulations establishing the method

19

or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services." *Id.* Strikingly, as the Court of Appeals noted in *CHI*, "every" provision of the PRM "rests on the 'reasonable cost' language in the statute and the regulations." *Id.* at 494.

Deriving the overall Medicare cost reimbursement system based on a concept as tenuous as reasonableness is far different than clarifying what constitutes a "reasonable collection effort." When considered in light of the actual PRM language at issue here, moreover, this is all the more evident. An action is "reasonable" if it is "rational," "equitable, fair, [or] just." *See* WEBSTER'S NEW INT'L DICTIONARY 2074 (2d ed. 1945). Yet, here, all that section 310 says is that, where a provider concludes that it is "rational" to use a collection agency to continue to pursue unpaid non-Medicare debt, it is equally "rational" for the provider do the same for Medicare debt of a like amount. The notion that a "reasonable effort" should be measured by the effort that the provider would take, and has taken, when its own finances are at stake—as opposed to the public fisc—does not require a leap of logic or any creativity beyond the usual process of interpretation. It merely requires application of the common-sense principle that it is "reasonable" to treat like cases alike. *See Univ. Health Servs. v. HHS*, 120 F.3d 1145, 1150 (11th Cir. 1997) ("[t]he undisputed purpose of [the reasonable collection efforts] requirement is to ensure that a provider treat similarly those accounts for which the provider has no guarantor as those for which the government acts as guarantor"); *see also Humana Hosp.—Sunrise v. Aetna Life Ins. Co.*, HCFA Admin. Dec. (Sept. 11, 1992) Med. & Med. Guide (CCH) ¶ 40,854 at 33,321 ("[R]easonable collection efforts can be determined by the manner in which the provider pursues the collection of debts for which it does not have a guarantor. Thus, the provisions of Sec. 310.A reasonably

require that . . . all uncollected patient charges of like amount [are referred] to the agency without regard for class of patient.").

The step, moreover, from the *regulatory requirement* that a provider engage in "reasonable collection efforts" to the *clarification* that a provider who uses a collection agency to pursue non-Medicare debt should do the same when pursuing similar Medicare debt is, if anything, less substantial than the interpretive moves in *Guernsey*, *National Medical*, and *Sentara-Hampton.* PRM section 233, at issue in *Guernsey*, construed "the statutory ban on cross-subsidization and the regulatory requirement that only the actual cost of services rendered to beneficiaries during a given year be reimbursed," 514 U.S. at 99, to mean that an accounting loss resulting from the refinancing of certain bonds had to be amortized over the life of the old bonds, *id.* PRM section 2203, at issue in *National Medical*, construed the regulatory phrase "customarily" to turn on state-wide custom, as opposed to the provider's own practice. 43 F.3d at 693-94. And, PRM section 226, at issue in *Sentara-Hampton*, interpreted a regulatory "financial need" requirement to turn, in the relevant context, on whether funds were "contractually committed." 980 F.2d at 752-53. In each of these cases, the PRM did far more than merely repeat or paraphrase the regulatory or statutory text, and in each case, the PRM interpretation was not compelled by the regulations and statute. In each case, the Secretary adopted an interpretation that made sense of the overall legal framework and that provided clarity to both providers and fiscal intermediaries regarding how the regulations should be applied. The Secretary did no more than that here.

*CHI* also differs from the present case—as well as *Guernsey*, *National Medical*, and *Sentara-Hampton*—in another, significant respect. The PRM provision at issue in *CHI*, among other highly-technical specifications, set a specific numerical limit on the percentage of an

offshore captive insurance company's assets that could be invested in equity securities. 617 F.3d at 495. Relying on Judge Henry Friendly's observation that an agency is typically legislating when it articulates a rule in "numerical terms" that are not themselves derived from the statute or record, the Court of Appeals concluded that "the sort of detailed—and rigid—investment code set forth in" the PRM was in "no way an interpretation of 'reasonable costs.'" *Id.* at 495-96. The Seventh Circuit reached a similar conclusion in *Hoctor v. United States Department of Agriculture*, 82 F.3d 165 (7th Cir. 1996). In that case, the Department of Agriculture purported to "interpret" a regulation requiring that facilities for housing animals "be constructed of such material and of such strength as appropriate for the animals involved," 82 F.3d at 167-68, to mean that "dangerous animals" must be held "inside a perimeter fence at least eight feet high," *id.* at 169. As the Court of Appeals explained, the choice of eight feet in height was "arbitrary," not in the "'arbitrary and capricious' sense," but in the sense that "[t]here is no way to reason to an eight-foot-perimeter-fence rule as opposed to a seven-and-a-half foot fence or a nine-foot fence or a ten-foot fence." *Id.* at 170.

Here, had the Secretary adopted a rule of debt collection that required the provider to send ten letters, two weeks apart, in 18 point type, with at least three containing a threat of litigation, these observations might apply. But section 310 does not resemble the type of detailed code provision Judge Friendly envisioned or that was at issue in *CHI* or *Hoctor*. Unlike the "rigid" and "detailed" "investment code" at issue in *CHI*, or the eight-foot-fence requirement at issue in *Hoctor*, PRM section 310 does not impose a fixed numerical value taken from a wide range of equally plausible values. To the contrary, it is the provider that decides whether use of a collection agency is economically prudent and the number of months such collection efforts should be pursued, and section 310 merely requires that the provider treat the collection of debt

inuring to the benefit of the government as favorably as it treats the collection of debt inuring to its own benefit.

Plaintiff's reliance on *United States v. Picciotto*, 875 F.2d 345 (D.C. Cir 1989), is also misplaced.  In that case, the Court of Appeals invalidated a Park Service rule placing certain conditions on park use permits.  *Id.* at 346.  The Park Service argued that the rule represented an interpretation of an "open-ended" regulation providing that permits could include "additional reasonable conditions."  *Id.* at 346-47.  The Court disagreed, holding that "an interpretive rule explains an existing requirement; it does not impose an 'additional' one."  *Id.* at 348.  The Court cautioned that if interpretive rules could be used to add binding requirements to open-ended regulations, "an agency [could] grant itself a valid exemption to the APA for all future regulations, and be free of APA's troublesome rulemaking procedures forever after, simply by announcing its independence in a general rule.  That is not the law."  *Id.* at 346-47.  Here, in contrast, section 310 does not add a new requirement, but rather clarifies what it means to engage in a "reasonable collection effort."

The Court agrees with Plaintiff that the regulatory "reasonable collection efforts" requirement does not "compel" the Secretary's interpretation.  But the agency's interpretation need not follow inexorably from the underlying text in order for the interpretation to be "logically justifie[d]."  *See CHI*, 617 F.3d at 494.  The Secretary has often interpreted ambiguities in the Medicare Act or the governing regulations by choosing one interpretation from a "range of reasonable meanings."  *See, e.g.*, *Sentara-Hampton*, 980 F.2d at 756 (upholding the Secretary's interpretation); *see also Picciotto*, 875 F.2d at 347 ("This court has previously found agency rules explaining ambiguous terms in statutes and regulations to be interpretive.").  That, in fact, is what agencies do on a daily basis when they engage in the "continuous" process

of interpreting and enforcing the law.  *See Hoctor*, 82 F.3d at 170.  And, because agencies may

"interpret" their regulations even in the face of multiple permissible constructions, absent a

specific prohibition, they are permitted to replace one permissible interpretation of an ambiguous

provision with another permissible interpretation without engaging in notice and comment

rulemaking.  *See, e.g.*, *Perez*, 135 S. Ct. at 1203-04.

Finally, Plaintiff argues that section 310 cannot be interpretive because it represents "a

hard, bright-line cut-off that brooks no dissent."  Dkt. 16-1 at 25.  Under this theory, if section

310 were merely an interpretive rule, it could not operate in a categorical manner; the Secretary

would be obliged to make discretionary exceptions when justified by the facts of the case.

Plaintiff cites no support for this proposition, and the Court is not aware of any.  But, in any

event, PRM provisions, although entitled to great weight, "do not have the force and effect of

law and are not accorded that weight in the adjudicatory process."  *Guernsey Mem. Hosp.*, 514

U.S. at 99; *see also* 42 C.F.R. § 405.1867.  Moreover, as noted above, the Secretary is generally

free to amend section 310 without engaging in notice and comment rulemaking, so long as the

new interpretation is also consistent with the statute and regulations.  *See Perez*, 135 S. Ct. at

1208-09; *Guernsey*, 514 U.S. at 100.

This is not to say, however, that section 310—like other interpretive rules contained in

the PRM—does not serve an important, and at times dispositive, function.  It represents the

Secretary's considered interpretation of the "reasonable collection efforts" regulation, and that

regulation does have binding legal effect.  The fact that section 310 might thus establish the

Secretary's current "bright-line" test for whether certain costs are reimbursable, however, does

not mean that section 310 is a legislative rule.  To the contrary, many interpretive rules are at

times outcome determinative, and the Court of Appeals has recognized that even a "bright-line"

24

rule can be interpretive.  *See Am. Mining Cong.*, 995 F.2d at 1112 (describing the rule in

*Fertilizer Inst. v. EPA*, 935 F.2d 1303 (D.C. Cir. 1991)).

The Court, accordingly, agrees with the Secretary that section 310 is an interpretive rule,

not a legislative rule and thus was not subject to the notice and comment requirement of the

APA.

## B.  Was The Secretary Required To List Section 310 In The Federal Register?

Plaintiff further argues that, even if properly treated as an interpretive rule, section 310 is

ineffective because it was not included in a list published in the Federal Register.  *See* Dkt. 16-1

at 26.  The Medicare Act requires the Secretary to "publish in the Federal Register, not less

frequently than every 3 months, a list of all manual instructions, interpretative rules, statements

of policy, and guidelines of general applicability," excluding those published in accordance with

notice and comment and those "previously published in a list under this subsection."  OBRA,

Pub. L. No. 100-203, § 4035(c), 101 Stat. 1330-78, *codified at* 42 U.S.C. § 1395hh(c)(1).

Applying this provision in *Chippewa Dialysis Services v. Leavitt*, 511 F.3d 172 (D.C. Cir. 2007),

the Court of Appeals concluded that the notice requirement applied to the guideline at issue, but

held that the Secretary's decision was supported by an alternative rationale for two of the

plaintiffs and that a remand regarding the alternative rationale was necessary with respect to the

third plaintiff.  *Id.* at 178.

The Court is not persuaded that the publication requirement applies to section 310.  It is

well settled that statutes are generally not given retroactive effect absent an express indication

otherwise.  *See, e.g.*, *United States v. St. Louis, S.F. & T.R. Co.*, 270 U.S. 1, 3 (1926).

Accordingly, because section 1395hh(c)(1) was enacted in 1987, *see* Pub. L. No. 100-203, four

years after section 310 was last revised, *see* Dkt. 26-2, it presumptively does not apply to section

310.  The legislative history, moreover, clarifies that the language ultimately codified as section

1395hh(c)(1) "[a]pplies on or after the date of enactment of this Act, *but does not apply to*

*instructions, rules, statements, and guideline [sic] issued before January 1, 1988*."  H.R. Rep.

No. 100-495, 564 (1987) (Conf. Rep.) (emphasis added).  And shortly after section 1395hh(c)(1)

was enacted, the Secretary construed it to apply only prospectively.  *See* Quarterly Listing of

Program Issuances, 53 Fed. Reg. 21730, 21730 (June 9, 1988) (stating that the publication

"requirement applies to items issued beginning December 21, 1987," i.e., the date it was

enacted).  Although deference is not necessary to resolve the present issue, if there were any

doubt, the deference accorded to the Secretary's interpretation of the Medicare Act would

resolve any lingering question on this point.  *See Chevron U.S.A. Inc. v. Natural Res. Defense*

*Council, Inc.*, 467 U.S. 837, 842-45 (1984); *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225

(D.C. Cir. 2003).

Plaintiff argues that Congress must have intended section 1395hh(c)(1) to have

retroactive effect, since the provision provides that the Secretary need not list published

regulations or materials that "have not been previously published in a list under this subsection."

42 U.S.C. § 1395hh(c)(1)(B).  According to Plaintiff, if the publication requirement were not

retroactive, the quoted language would constitute surplusage.  The Court does not agree.

Without the "previously published" language, section 1395hh(c)(1)(B) would have a very

different meaning.  It would require the Secretary to publish "a list of *all*" of her informal

guidance every three months—*i.e.*, a cumulative list of all guidance promulgated since the statute

was enacted.  The "previously published" language clarifies that the list need not be cumulative;

it may omit both published regulations and previously published informal rules and guidance.

Plaintiff objects that the language cannot serve this purpose because a cumulative list

requirement would be absurd.  Although perhaps excessive, it is not clear why that reading would be absurd, since Plaintiff's reading would require the Secretary's first list to include prior guidance many decades old.  And even if it is absurd, Congress might have included the "previously published" language just to be certain.  Given that Congress drafted the statute against a backdrop including a presumption against retroactivity, the Court is convinced that the Secretary's reading is the better one.

The Court of Appeals had no occasion in *Chippewa* to consider whether the publication requirement was retroactive, because the challenged standard was derived from data collected after section 1395hh(c)(1) was enacted.  *See* 511 F.3d at 174.  Nor have the parties identified any decisions of the Courts of Appeals that address whether section 1395hh(c)(1) has retroactive effect, although at least one district court has concluded that it is not retroactive.  *See Abbott Radiology Assocs. v. Shalala*, 992 F. Supp. 212, 227-28 (W.D.N.Y. 1997) ("Section 1395hh(c)(1) does not apply retroactively.  Therefore, the Secretary's alleged failure to publish the [1977] HCFA policy does not render the policy invalid.").  In light of the presumption against retroactivity, the legislative history, the Secretary's concurrent interpretation of the statute, and the absence of any countervailing evidence, the Court concludes that section 1395hh(c)(1)'s publication requirement is not retroactive.  Accordingly, the Secretary was not required to publish the 1983 version of section 310 in the Federal Register.[5]

---

[5]  In the alternative, the Secretary argues that she satisfied section 1395hh(c)(1)'s publication requirement by "publish[ing] in the Federal Register, . . . a list" that included section 310.  She cites the first list published pursuant to section 1395hh(c)(1), which included brief descriptions of her pre-existing guidance materials and stated that "The Provider Reimbursement Manual provides instructions for determining the amount of reimbursement for providers of services participating in the Medicare program."  53 Fed. Reg. at 21732.  That list, however, did not mention or describe section 310, and the parties have not briefed whether the publication

**C.  Did The Secretary's Decision Violate The Bad Debt Moratorium?**

The next question presented is whether the statutory Bad Debt Moratorium precluded the Board from giving the collection agency requirement in PRM section 310 the strict construction that it applied here.  Plaintiff contends that the interpretation applied below differs markedly from the Board's pre-1987 construction of the same requirement and that, accordingly, the decision is contrary to the Bad Debt Moratorium.  In support of this contention, Plaintiff relies on the Court of Appeals for the Sixth Circuit's unpublished decision in *Detroit Receiving Hospital v. Shalala*, 1999 WL 970277 (6th Cir. 1999), which concluded that the Secretary violated the Moratorium by shifting from treating section 310's collection agency requirement "as a guideline which could be set aside where sound business and financial judgments justified a provider in doing so" before 1987, to treating the requirement as an absolute and inflexible command after 1987, *id.* at *12-*13.  For the reasons explained below, the Court agrees that the Board's decision cannot stand.

The Bad Debt Moratorium was adopted in the wake of proposals from the HHS Inspector General to make sweeping changes regarding the recovery and reimbursement of Medicare bad debt, in particular, "either eliminating bad debt reimbursement entirely or attempting to recoup the costs by garnishing the Social Security checks of debtors." *Hennepin Cnty.*, 81 F.3d at 747; *see id.* at 750-51; *Foothill Hosp.*, 558 F. Supp. 2d at 3-5, 6-7; *see also* Dkt. 25-1, at 2 (Inspector General's semiannual report).  The Moratorium represented Congress' "attempt to shield Medicare providers from the Inspector General's proposed policy changes," *Foothill Hosp.*, 558

---

requirement should be construed to require "a list" of the Secretary's manuals, "a list" of individual provisions in those manuals, or something more detailed.  There is reason to doubt that mention of the PRM as a whole satisfies the statutory requirement, but, because the Court concludes that the publication requirement is not retroactive, it need not reach that issue.

F. Supp. 2d at 3, by freezing the Secretary's bad debt reimbursement policy as it existed on

August 1, 1987, the Moratorium's effective date, *see* Pub. L. No. 100-203, tit. IV, § 4008(c),

1010 Stat. 1330-55.

Following adoption of the Moratorium, however, the Inspector General "continued to

urge closer scrutiny of bad debt requests." *Hennepin Cnty.*, 81 F.3d at 747.  In response,

Congress amended the Moratorium.  The 1988 amendment added, among other things, language

clarifying that the policies frozen in place "includ[ed] criteria for . . . determining whether to

refer a claim to an external collection agency."  Pub. L. No. 100-647, tit. VIII, § 8402, 102 Stat.

3798.  Its legislative history reflects the conferees' concern that the Inspector General's

recommendations concerning, among other things, providers' use of collection agencies, would

"create requirements in addition to those in the Secretary's regulations, the decisions of the

[Board], and relevant program manuals and issuances."  *See* H.R. Rep. No. 100-1104 (1988)

(Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. at 5337.

In its final form, the Moratorium declares that, "[i]n making payments to hospitals" under

Medicare,

> the Secretary . . . shall not make any change in the policy in effect on August 1,
> 1987, with respect to payment under [the Medicare program] to providers of
> service for reasonable costs relating to unrecovered costs associated with unpaid
> deductible and coinsurance amounts incurred under such title (including criteria
> for what constitutes a reasonable collection effort, *including criteria . . . for
> determining whether to refer a claim to an external collection agency*).  The
> Secretary may not require a hospital to change its debt collection policy if a fiscal
> intermediary, in accordance with the rules in effect as of August 1, 1987, with
> respect to criteria for . . . determining whether to refer a claim to an external
> collection agency, has accepted such policy before that date, and the Secretary
> may not collect from the hospital on the basis of an expectation of a change in the
> hospital's collection policy.

42 U.S.C. § 1395f note (emphasis added).

The parties agree that PRM section 310 existed in its present form prior to August 1, 1987, and that *its* requirement to refer Medicare and non-Medicare accounts of like amount for collection was part of the policy frozen in place by the Moratorium.  The parties also agree that the Secretary's "August 1, 1987 'policy' as a whole" included administrative decisions applying section 310's referral requirement.  *See* Dkt. 29 at 7; *see also* 1988 U.S.C.C.A.N. at 5337.[6]  The parties disagree, however, about whether the strict interpretation of section 310 espoused by the Secretary and applied in this case constitutes a departure from how section 310 was interpreted and applied before the Moratorium took effect.  The Secretary maintains that, with exceptions not relevant here, section 310 was applied in the same manner before and after the Moratorium took effect.  Plaintiff, in contrast, argues that the Secretary's approach to the referral of Medicare bad debt to collection agencies underwent a fundamental change: according to Plaintiff, before the Moratorium took effect, the requirement that a provider that refers non-Medicare accounts to a collection agency also refer Medicare accounts to a collection agency was not treated by the Secretary as a hard and fast rule, but rather permitted a provider to demonstrate on a case-by-case basis that the referral of the Medicare bad debt did not make sound business sense.  After the Moratorium took effect, however, Plaintiff contends that the policy shifted and became inflexible.  If non-Medicare accounts were referred to a collection agency, the provider was required to refer Medicare bad debt as well, regardless of whether there was a reasonable

---

[6]  As provided in PRM section 2927, "[d]ecisions by the Administrator are not precedents for application to other cases.  A decision by the Administrator may, however, be examined and an administrative judgment made as to whether it should be given application beyond the individual case in which it was rendered.  If it has application beyond the particular provider, the substance of the decision will, as appropriate, be published as a regulation, HCFA Ruling, manual instruction, or any combination thereof so that the policy (or clarification of policy having a basis in law and regulations) may be generally known and applied by providers, intermediaries, and other interested parties."  *See also Cmty. Care*, 318 F.3d at 227.

prospect of recovery.  Plaintiff contends that this shift in policy violated the Bad Debt

Moratorium.

Plaintiff relies on three Board decisions predating the Moratorium, all of which

concluded that "reasonable collection efforts" were made despite the providers' referral of only

non-Medicare accounts to collection agencies.  *See Cincinnati Gen. Hosp. v. BCBSA/BCBS of*

*Sw. Ohio*, PRRB Dec. No. 81-D52 (May 29, 1981) (addressing cost reporting period ending in

1977), AR 188-193; *Reed City Hosp. v. BCBSA/BCBS of Mich.*, PRRB Dec. No. 86-D67 (Feb.

20, 1986) (addressing cost reporting period ending in 1982), AR 183-86; *St. Francis Hosp. &*

*Med. Ctr. v. BCBSA/Kan. Hosp. Servs. Ass'n, Inc.*, PRRB Dec. No. 86-D21 (Nov. 12, 1985)

(addressing cost reporting periods ending in 1980 through 1983), AR 195-202, *aff'd in relevant*

*part without opinion by* HCFA Admin. Dec. (Jan. 8, 1986), AR 204-06.  Plaintiff argues that in

each of these decisions, the Board "allowed sound business judgment to trump the manual's

requirement to refer Medicare accounts to a collection agency," Dkt. 19-1 at 23, and that these

decisions demonstrate that the Secretary's pre-Moratorium policy required referral of Medicare

accounts only where it was not inconsistent with the provider's "sound business judgment," *id.*

Plaintiff contends that the approach to section 310 applied by the Board in this case marked a

shift in policy from these flexible pre-Moratorium decisions.

Plaintiff made this argument before the Board, which rejected Plaintiff's contention.  AR

16-17.

### 1.  *The Board's Decision*

Because the CMS Administrator declined to review the Board's decision, AR 1-2, its

decision constitutes the final decision of the Secretary for purposes of this action.  As noted

above, the Board considered the Providers' Bad Debt Moratorium argument, but concluded that

no change in policy occurred.  According to the Board, "[t]he requirements at issue in [the Providers' administrative] appeal regarding reasonable collection efforts are clearly not new law or policy."  AR 16.  Thus, in the Board's view, nothing in its decision implicated the Bad Debt Moratorium.

The Board's analysis is cursory.  In two sentences it distinguished the three pre-Moratorium precedents relied upon by Plaintiff (*Cincinnati General*, *Reed City*, and *St. Francis*), concluding that they are "not relevant to the Bad Debt Moratorium issue" because they applied versions of section 310 that were superseded by the 1983 version that is at issue here.  AR 16.  The Board explained that the pre-1983 versions of section 310 treated Medicare and non-Medicare bad debt "differently . . . because of a prohibition against using or threatening court action to collect Medicare bad debts."  *Id.*  The Board also cited to the HCFA Administrator's 1996 decision in *Dodge County*, *id.* n.35, which provides a slightly more expansive explanation for why the Board concluded that the three pre-Moratorium decisions were inapposite, *see* Dkt. 16-3 at 1-8.  There, the Administrator considered the same question presented here, and, like the Board did here, declined to rely on the three precedents because they were based on "an earlier version of the PRM."  *Id.* at 7.  *Dodge County* explained that the prior rule prohibiting collection agencies from threatening to bring suit against Medicare beneficiaries "prevented providers from affording identical treatment for both Medicare and non-Medicare accounts as reflected in the [three] cited cases."  *Id.*  Because the prohibition on the use or threat of litigation was eliminated in 1983, it became possible at that point to treat Medicare and non-Medicare bad debt on equal terms.  *Id.*; *see* Dkt. 26-2.

Two other aspects of the Board's decision in this matter warrant brief mention.  First, although the Board's decision in *Dodge County* was reversed by the Administrator's decision,

the Board's decision here nonetheless goes on to distinguish that decision.  *See* AR 17.  It simply

noted, however, that *Dodge County* was decided in 1996, "well after" the effective date of the

Bad Debt Moratorium and observed that the 1996 decision relied on the three precedents that it

had just concluded were irrelevant.  *Id.*  Second, after concluding that *Cincinnati General*, *Reed*

*City*, and *St. Francis* could all be distinguished, the Board went on to apply section 310 in

categorical terms, without recognizing an exception for futile or unsound collection efforts.  *Id.*

On this basis, the Board denied the Providers' claim for bad debt reimbursement.

### 2.  *APA Review*

"The Board's decision . . . is entitled to considerable deference from a reviewing court."

*Marymount Hosp. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994).  The Medicare Act incorporates

APA standards of review, *see* 42 U.S.C. § 1395oo(f)(1), and thus the Board's decision may be

set aside only "if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law, or unsupported by substantial evidence in the administrative record," *Marymount*

*Hosp.*, 19 F.3d at 661 (quotation marks omitted); *see also Chippewa*, 511 F.3d at 176.  The

Secretary's legal conclusions will be set aside if they are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); *Chippewa*, 511

F.3d at 176.  In considering this question, courts must defer the Secretary's interpretation of her

own regulations, *see id.*; *Grossmont Hosp. Corp.*, 2015 WL 4666540, *6, and, more importantly

for present purposes, to her interpretation of relevant administrative precedents, *Entergy Servs.,*

*Inc. v. FERC*, 319 F.3d 536, 541 (D.C. Cir. 2003); *Cassell v. FCC*, 154 F.3d 478, 483 (D.C. Cir.

1998).  The Secretary's factual conclusions, in turn, will be set aside if they are not supported by

substantial evidence in the record.  5 U.S.C. § 706(2)(E); *Chippewa*, 511 F.3d at 176.

"'Substantial evidence,' in the sense used in the Administrative Procedure Act, is the amount of

evidence constituting 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn . . . is one of fact for the jury.'" *Kay v. FCC*, 396 F.3d 1184, 1188 (D.C. Cir. 2005) (citation omitted) (quoting *Illinois Cent. R.R. v. Norfolk & W. Ry.*, 385 U.S. 57, 66 (1966)); *see Ass'n of Data Processing Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683-84 (D.C. Cir. 1984). "[T]he substantial evidence standard requires the court to review the record itself to determine whether it substantiates the story the agency would have it tell." *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004). Ultimately, the question for the Court is whether the Board's conclusion that no relevant change in bad debt policy occurred after the Moratorium took effect is a reasonable one. *See, e.g.*, *Marymount Hosp.*, 19 F.3d at 662-63.

Notwithstanding this deferential standard of review, the Court concludes that the Board's decision is not supported by the legal and factual record. Before turning to the difficulties with the Board's decision, the Court notes that the Board was entirely correct to reject Plaintiff's reliance on the *Cincinnati General Hospital* decision. That decision addressed a claim for reimbursement for the reporting period ending on June 30, 1977. AR 188. As that decision correctly explains, the version of section 310 applicable at that time required "only that a reasonable collection effort should be made by a provider, applying sound business judgment." AR 191. That "instruction" was dropped in 1978, when section 310 was revised to require "that the collection effort *must be similar to* the effort the provider puts forth with regard to non-Medicare patients." *Id.* (emphases added).

The Board's finding that *Reed City* and *St. Francis* did not address the question presented here, however, is on shakier ground. Those decisions applied the 1981 version of section 310. Like the present version, the 1981 version of section 310 explained that "[w]here a collection

34

agency is used, Medicare expects the provider to refer all uncollected patient charges of like

amount to the agency without regard to class of patient."  Dkt. 26-1 at 2 (HCFA Transmittal No.

246, Feb. 1981).  However, unlike the version at issue here, the 1981 version included a second

paragraph based on the then-existing prohibition on using the threat of litigation to recover

Medicare bad debt.  The additional paragraph explained:

> It is not the intent of the Medicare bad debt principle that court action be
> threatened or taken before these uncollected amounts can be reimbursed under
> this principle.  The provider should instruct the collection agency not to use, or
> threaten to use, court action to collect the Medicare deductible and coinsurance
> amounts.  However, where a collection agency refuses to accept Medicare
> accounts under the above Medicare restriction on legal action . . . referral of
> unpaid Medicare deductible and coinsurance amounts is not required.  Where
> referral to a collection agency is not made because of either of these restrictions,
> this does not, however, relieve the provider of the responsibility to put forth a
> reasonable collection effort as defined above."

*Id.* at 2; *see also id.* at 1 (explaining that the 1981 version "permit[s] providers to meet the

reasonable collection effort requirements in situations where unpaid Medicare [debts] are not

referred to a collection agency that refuses to accept Medicare referrals because of the

prohibition against threatening legal action").  The prohibition on legal action was rescinded for

cost reporting years beginning on or after January 15, 1983.  *See* Dkt. 26-2 at 1 (HCFA

Transmittal No. 278, Jan. 1983) (explaining that the 1983 version "eliminate[d] the restriction

against using or threatening court action to collect bad debts from Medicare beneficiaries").

The Board's decision here rested on the premise that the flexible approach applied in

*Reed City* and *St. Francis* is attributable to the additional paragraph in the 1981 version of

section 310.  *See* AR 16.  This paragraph was effective during the years at issue in *Reed City* and

*St. Francis*, but it was eliminated in 1983, well before the Moratorium took effect.  In the

Board's view, when the paragraph prohibiting threats of legal action was deleted, the flexible

approach reflected in *Reed City* and *St. Francis* no longer applied.  As explained below, the

Court is unpersuaded.

In *Reed City*, it was undisputed that "[o]nly non-Medicare bad debts were sent to the

collection agency."  AR 184.  The provider argued that it was still entitled to reimbursement for

Medicare bad debt because "its recovery rate would have been negligible due to the highly

indigent population of its service area."  *Id.*  In support of this assertion, the provider pointed to

evidence that it referred Medicare bad debt to the collection agency following the disallowance,

"with virtually insignificant results."  *Id.*  The provider made no reference to the ban on threats

of litigation, instead relying exclusively on the asserted indigency of the relevant population, and

arguing that "Medicare bad debts . . . are allowable when reasonable in-house collection efforts

are made."  *Id.*

The fiscal intermediary responded to the provider's argument by making the same

argument the Board adopted here and that the Secretary presses in this action: section 310

requires that "similar collection efforts" be made for Medicare and non-Medicare accounts.  *Id.*

Since the provider did not treat those accounts alike, the fiscal intermediary asserted that the

provider's claim was properly disallowed.  AR 185.  The intermediary, moreover, noted two

additional facts that undercut the Board's efforts to distinguish *Reed City* based on the

prohibition against threats of litigation in the 1981 version of section 310.  First, the 1981 version

of section 310 provided that "[t]he provider should instruct the collection agency not to use, or

threaten to use, court action to collect the Medicare [bad debt]," and that "where a collection

agency refuses to accept Medicare accounts under the above Medicare restriction on legal action

. . . referral of [Medicare bad debt] is not required."  Dkt. 26-1 at 2.  Second, as noted in *Reed

City*, there was "no evidence" "to show that the collection agency refused to accept Medicare"

accounts and there was "no evidence" that the provider even notified the collection agency that it would have been prohibited from threatening litigation against Medicare beneficiaries.  AR 184. Thus, not only did the provider in *Reed City* decline to rely on the prohibition on litigation as support for its position, it apparently could not have done so: there was no evidence that it had complied with the relevant requirements or that the collection agency would have declined to pursue the Medicare bad debt on that basis.

Finally, the Board's analysis in *Reed City* makes no mention of the restriction on legal action.  Without elaboration, the Board merely found that "the provider's collection policies reflect that it maintained reasonable collection efforts on Medicare accounts deemed uncollectible as required" by the regulations, and that "[t]he [i]ntermediary, in fact, concurs that the in-house collection efforts were acceptable and appropriate."  AR 185.  In short, the plain language of the *Reed City* decision shows that it was based on a flexible view of the "reasonable collection efforts" requirement, and there is no evidence that it was based, as the Board concluded here, on the prohibition on the threat of legal action.

Likewise, there is no evidence that the *St. Francis* decision was based, even in part, on the prohibition on the threat of legal action against Medicare beneficiaries.  As in *Reed City*, the provider made no reference to this prohibition.  It simply argued that it was justified in not referring Medicare bad debt to a collection agency because there was little prospect of successful recovery on Medicare accounts.  AR 198-99.  As in *Reed City*, the intermediary responded that reimbursement was "properly disallowed because the provider's collection efforts for non-Medicare and Medicare uncollected amounts were not consistent."  AR 199.  Echoing the Secretary's argument here, the intermediary asserted "that the provider's collection efforts were not reasonable because the non-Medicare uncollectable accounts were referred to an outside

collection agency for further collection attempts while the Medicare uncollectable accounts were not similarly referred but were written off as bad debts." *Id.*

Without making any reference to the prohibition on the threat of litigation, the Board found that the provider's efforts met "the reasonable effort requirements" in the Secretary's regulations. AR 200. The Board explained, in terms that Plaintiff asserts should apply equally here, that "[i]t is reasonable to write off bad debts when their pursuit would be too costly." AR 201. The Board went on to note, moreover, that the futility of an effort to recover Medicare bad debt through the collection agency was evidenced by fact that the provider used "a collection agency for the fiscal years ending 1983 and 1984, but did not recover amounts from" its Medicare bad debts. AR 201. Significantly, by 1984 the prohibition on the threat of litigation had been lifted, yet the Board made no reference to this fact.

Thus, in both cases relied upon by Plaintiff, the providers referred non-Medicare bad debt to collection agencies, but not Medicare bad debt. In both cases, the intermediaries disallowed reimbursement based on section 310, and the providers argued on appeal that their claims should have been allowed because the prospect of recovery was negligible. Neither provider made reference to the prohibition on the threat of litigation. In both cases, the intermediaries, moreover, continued to press their position that section 310 required disallowance due to the disparate treatment of non-Medicare and Medicare bad debt. And, in both cases, without making any reference to the prohibition on the threat of litigation, the Board allowed the claims because the providers had made reasonable collection efforts.

To be sure, courts generally defer to an agency's interpretation of its own precedents. *See Entergy Servs.*, 319 F.3d at 541; *Cassell*, 154 F.3d at 483. Here, however, the Board's rationale for distinguishing *Reed City* and *St. Francis* finds *no* support in those decisions or in

any other materials pre-dating the Moratorium.  The Board did not cite, and the administrative

record does not contain, any pre-Moratorium decision or guidance that applies section 310's

referral requirement as a hard and fast rule.  The Administrator's 1996 decision in *Dodge*

*County*, *see* Dkt. 16-3 at 1-8, like the Board's decision here, is simply a retrospective

characterization of the Secretary's pre-Moratorium policy; it does not illustrate how section 310

was actually applied prior to 1987, and its efforts to distinguish *Reed City* and *St. Francis* suffer

from the same difficulties raised by the Board's decision in this case.  The Secretary argues that

the Board's understanding of the pre-Moratorium policy is supported by the plain language of

section 310, which states that providers are required to refer Medicare accounts and non-

Medicare accounts of like amount.  That language, however, was also found in the pre-1983

version of section 310—which the Secretary undisputedly applied more flexibly than her current

approach.  *See* Dkts. 26-1 at 2, 26-2 at 3.

Nor has the Secretary proffered any additional evidence that the decision here was

consistent with the Board's pre-Moratorium bad debt policy.  The Court, for example, requested

that the parties attempt to locate the briefs in *St. Francis* to see if they might shed further light on

that decision, but they were unable to do so.[7]  The Secretary suggests that two additional

administrative decisions—*Scotland Memorial Hospital v. Blue Cross and Blue Shield*

*Association*, 2011 WL 512509, HCFA Admin Dec. (Nov. 8, 1984), and *Lakewood Hospital v.*

*Blue Cross and Blue Shield Association*, 2011 WL 502418, PRRB Dec. No. 83-D63 (Apr. 29,

1983)—support the conclusion that the flexible approach applied in *Reed City* and *St. Francis*

---

[7] The Court thanks the parties for their efforts.

was a product of the short-lived prohibition on the threat of litigation, and not a more general

interpretation of section 310.  Those decisions were not mentioned in the Board's decision here

and are not otherwise part of the administrative record.[8]  But, in any event, they fail to offer

meaningful support for the Secretary's position because, unlike *Reed City* and *St. Francis*, they

expressly invoked the prohibition on the threat of litigation as a justification for differential

treatment of Medicare and non-Medicare accounts.  In *Scotland Memorial Hospital*, the Deputy

Administrator observed "that the procedures differed only at the stage where threats of legal

action entered the provider's collection process," 2011 WL 512509 at *2, and in *Lakewood*

*Hospital*, the Board noted that the provider used secondary collection agencies to take "further

legal action" against non-Medicare accounts, 2011 WL 502418 at *3.  The fact that providers

were permitted to rely on the exception relating to legal action says nothing about whether

section 310 was construed flexibly where the providers did not invoke that exception.[9]

---

[8]  The Court notes that the provider in *Reed City* cited the Board's decision in *Scotland Memorial Hospital* as support for the proposition that "Medicare bad debts and collection fees are allowable when reasonable in-house collection efforts are made."  AR 184.  As already noted, however, the provider did not argue that the pre-1983 prohibition against litigation justified its failure to refer Medicare accounts, and the Board ruled in the provider's favor without mentioning the Board's or the Deputy Administrator's decision in *Scotland*.  *See* AR 185.

[9]  If the exception contemplated in the additional paragraph of the 1981 version is strictly construed, it is not clear that it actually applied in *Lakewood Hospital*, because it does not appear that the collection agencies affirmatively refused the provider's request to pursue Medicare bad debts; the intermediary in that case asserted that there was "no evidence" that the collection agencies had refused to comply with the prohibition on legal action.  *See* 2011 WL 502418, at *3.  But where a debt was forwarded to a collection agency for "further legal action," 2011 WL 502418 at *3, it is reasonable to infer that the collection agency would have had nothing to do with respect to Medicare bad debts during the time that the litigation prohibition was in effect.  In *Scotland Memorial Hospital*, the provider had argued to the Board that its collection agency "followed a system of collection which threatened litigation" and "that a collection agency was contacted but refused to accept Medicare accounts" in part because "the threat of litigation could not be used."  *See Scotland Mem. Hosp. v. Blue Cross & Blue Shield Ass'n.*, PRRB Dec. No. 84-D174 (Sept. 12, 1984), Med. & Med. Guide (CCH) ¶ 34,225.

Both parties point to recent decisions in this jurisdiction addressing whether the Secretary's policy with respect to reimbursement for bad debt still pending at collection agencies had changed in violation of the Bad Debt Moratorium.  *See Cmty. Health Sys., Inc. v. Burwell*, 2015 WL 4104644, *20 (D.D.C. July 7, 2015) (affirming because plaintiffs "provided no persuasive evidence that the agency had a different policy" prior to the Moratorium); *Lakeland Reg'l Health Sys. v. Sebelius*, 958 F. Supp. 2d 1, 7-9 (D.D.C. 2013) (similar); *Foothill Hosp.*, 558 F. Supp. 2d at 11 (vacating and remanding based on the conclusion that the administrative decision "constitutes a change in policy in violation of the Bad Debt Moratorium"); *Dist. Hosp. Partners, L.P. v. Sebelius*, 932 F. Supp. 2d 194, 200 (D.D.C. 2013) (similar).  These decisions reached conflicting conclusions, and in any event, did not address the pre-Moratorium administrative precedents at issue here.

The Court thus concludes that the inflexible interpretation of section 310 endorsed by the Secretary and applied by the Board represents an impermissible change from the more flexible pre-Moratorium policy reflected in *Reed City* and *St. Francis*.  The Board's decision is entitled to substantial deference.  *See, e.g.*, *Marymount Hosp.*, 19 F.3d at 661.  But as explained above, the Board's effort to distinguish *Reed City* and *St. Francis* finds no support in the administrative record.  Whether treated as lacking "substantial evidence," *see Dist. Hosp. Partners*, 932 F. Supp. 2d at 200; *Lakeland Reg'l Health Sys.*, 958 F. Supp. 2d at 7-8, or as "arbitrary and capricious," the end result is the same: the Board's decision is unreasonable and must be set aside.  *See* 5 U.S.C. §§ 706(2)(A), (E); *Petroleum Commc'ns v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action"); *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1497-98 (D.C. Cir. 1988).  In other contexts, the question whether the Board had

properly distinguished earlier decisions, as opposed to refining the standard applied in those decisions, might not make a difference.  But here, Congress prohibited the Secretary from making any change in bad debt policy while the Moratorium was in effect, and that statutory command has consequences that cannot be overcome through the retrospective re-characterization of pre-Moratorium decisions.

### 3.  *Alternative Grounds*

The Secretary argues that even if the Court concludes that the Secretary's policy violates the Bad Debt Moratorium, it should nonetheless affirm on the alternative ground that Plaintiff would lose even under the standard applied in *Reed City* and *St. Francis*.  *See* Dkt. 17-4 at 22. The Court agrees that even though the Secretary's pre-Moratorium policy permitted occasional exceptions, and therefore she is obligated to provide similar exceptions in the years at issue here, that does not mean Plaintiff has demonstrated its entitlement to such an exception.  As Plaintiff acknowledges, even under the standard applied in the *Reed City* and *St. Francis* decisions, it was the provider's burden to present evidence that the continued "pursuit" of Medicare bad debt "would 'be too costly'".  Dkt. 16-1 at 33 (quoting *St. Francis*, AR 201).

Plaintiff contends that it made the required showing, but the Board disregarded its evidence.  *See* Dkt. 16-1 at 33; Dkt. 19-1 at 27-28 ("The Board, as the trier of fact, never had the opportunity to opine on the persuasiveness of [Plaintiff's] testimony because it applied the Secretary's 'hard and fast' referral rule"); AR 12 ("the Providers contend that the record evidence, statistics, and testimony presented in this matter show that the Providers' accounts were uncollectible when claimed as worthless and that sound business judgment established that there was no likelihood of recovery in the future").  According to Plaintiff, the evidence in the administrative record shows that (1) beginning in December 2006, the Providers referred

42

Medicare accounts to a secondary collection agency and observed a collection rate of only a few

percent, *see* Dkt. 16-1 at 33; AR 168; (2) at the secondary collection stage, the average balance

of the non-Medicare accounts (approximately $3000) was six times larger than the average

balance of the Medicare accounts (approximately $500), *see* AR 99, 168, 170; (3) due to

"litigation costs" of $187.50 per account plus attorney's fees, "the cost of pursuit" of a $500

account "outweighs any recovery," *see* Dkt. 19-1 at 13; AR 97; (4) many collection techniques,

such as garnishment, are less effective on Medicare accounts due to the demographic

characteristics of Medicare beneficiaries, *see* Dkt. 16-1 at 28; AR 96-97; and (5) the average

payment on a Medicare account was less than 65% of the average payment on a non-Medicare

account, *see* AR 99, 168, 170.  Based on these factors, Plaintiff contends that further collection

efforts would have been futile.

       In response, the Secretary argues that Plaintiff's claim "is not bolstered by the types of

evidence that the [Board] . . . held persuasive" in *St. Francis* and *Reed City*, Dkt. 17-4 at 23,

because "Plaintiff failed to produce persuasive evidence that the referral of its Medicare accounts

for external collection would not have been cost effective," *id.*  In both decisions, the providers

offered evidence that, following the cost years at issue, they began referring Medicare accounts

to the collection agencies, without success.  In *St. Francis*, the intermediary's auditor confirmed

that "no amounts were recovered from the Medicare beneficiaries" for one of those years, AR

198, while in *Reed City*, the provider contended that referral of the Medicare accounts had

"virtually insignificant results," AR 184.  Here, however, the administrative record includes

testimony that the recovery rate for Medicare accounts at the secondary collections level "may be

equal to or slightly higher than the non-Medicare" recovery rate.  AR 105; *see* AR 11.  It also

appears that between December 2006 and March 2011, the secondary collection agency

recovered almost a quarter of a million dollars on Providers' Medicare accounts.  AR 99, 168.

Plaintiff argues that this represents a return of only three cents on the dollar, *see* AR 99, 168;

Dkt. 19-1 at 13, 27, but the return appears roughly comparable to (and maybe better than) the

return on Providers' non-Medicare accounts, *see* AR 99, 100, 170.  Even if Plaintiff is correct

that the cost of pursuing a $500 account outweighs the potential recovery, *see* AR 97, the same

ought to be true of *any* $500 account, not just Medicare accounts; Plaintiff does not appear to

have offered evidence relating to the prospect of recovery from larger Medicare accounts.  The

Secretary argues, moreover, that Plaintiff relies on generalizations about Medicare accounts as a

group and did not provide sufficient information to establish that the collection rate attributed to

the Providers' Medicare accounts "represented the collection rate for Medicare accounts that

were *similar in amount* to the non-Medicare accounts referred to secondary collection agencies."

Dkt. 17-1 at 24 (emphasis added).[10]  Finally, to the extent Plaintiff relies on *Cincinnati General*,

*see* Dkt. 16-1 at 34; Dkt. 19-1 at 22, the Court has already concluded that the Board correctly

distinguished that decision.

 "'[W]ith limited exception, the law does not allow [the reviewing court] to affirm an

agency decision on a ground other than that relied upon by the agency.'"  *Grossmont Hosp.*

*Corp.*, 2015 WL 4666540, at *6 (quoting *Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir.

2011)).  There is "[o]ne exception: 'when there is not the slightest uncertainty as to the outcome

of a proceeding on remand, courts can affirm an agency decision on grounds other than those

provided in the agency decision.'"  *Id.* (quoting *Manin*, 627 F.3d at 1243 n.1).  This case does

---

[10]  Not all non-Medicare accounts were referred to the secondary collection agency; accounts deemed uncollectible due to factors such as bankruptcy, death, or charity status were not referred.  *See* AR 95.  The administrative record does not indicate how many non-Medicare accounts were deemed uncollectible or what the values of those accounts were.

not fall within that narrow exception.  On the present record, the Court cannot conclude that the outcome on remand would be "certain" in favor of either party.  Accordingly, the Court remands for the Board to consider Plaintiff's arguments and evidence.

**D.  Was The Denial Of Reimbursement Arbitrary And Capricious?**

Finally, Plaintiff argues that even if the Secretary's policy does not violate the Bad Debt Moratorium, the denial of reimbursement in this case was arbitrary and capricious.  *See* Dkt. 16-1 at 35-38.  Plaintiff contends, *inter alia*, that the Providers complied with the literal requirements of PRM section 310, the Board's decision is not supported by the factual record, and the referral policy applied here is unfair.  *See id.*  Because the Court concludes that remand is appropriate, it need not reach these arguments.  On remand, the Board should apply the more flexible pre-Moratorium approach reflected in *Reed City* and *St. Francis* in order to determine whether the Providers engaged in "reasonable collection efforts" notwithstanding their differential treatment of Medicare and non-Medicare bad debt.

## IV.  CONCLUSION

For the reasons set forth above, the Court concludes that the Secretary's denial of

reimbursement was unreasonable because the rigid policy applied by the Board is inconsistent

with the more flexible approach applied prior to the Bad Debt Moratorium.  Accordingly, the

Court **GRANTS** in part and **DENIES** in part Plantiff's motion for summary judgment, Dkt. 16,

**DENIES** the Secretary's cross-motion for summary judgment, Dkt. 17, **VACATES** the Board

decision, and **REMANDS** for further proceedings consistent with this Memorandum Opinion.

An appropriate Order will issue separately.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 10, 2015